UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAMELA LITZSEY-THOMAS,

                              Plaintiff,

        v.

THE SALVATION ARMY,

                              Defendant.

**REPORT AND
RECOMMENDATION**

14-CV-65A

## I. INTRODUCTION

The Hon. Richard J. Arcara referred this case to this Court under 28

U.S.C. § 636(b).  (Dkt. No. 7.)  Pending before the Court is a motion by

defendant The Salvation Army for summary judgment under Rule 56 of the

Federal Rules of Civil Procedure ("FRCP").  (Dkt. No. 28.)  Plaintiff Pamela

Litzsey-Thomas, who is *pro se*, believes that defendant fired her because it no

longer wanted to deal with her car accident injuries and the job accommodations

that those injuries warranted.  Defendant asserts that it fired plaintiff solely

because she used agency letterhead, without permission, to write letters to Erie

County Family Court in behalf of defendant's clients.  Plaintiff rejects that

explanation on the basis that she had permission to use letterhead as part of her

job duties, and that the letters in question were not substantively different from

other letters that she wrote for her clients.

The Court has deemed the motion submitted on papers under FRCP 78(b).  For the reasons below, the Court respectfully recommends denying defendant's motion and setting the case for trial.

## II.  BACKGROUND

This case concerns allegations that defendant fired plaintiff days after she asked for additional time off to recover from injuries from a car accident.  Plaintiff entered a contract to work for defendant from March 12, 2012 to December 31, 2012.  The relationship between plaintiff and defendant was not a direct employer-employee relationship.  Rather, plaintiff came to defendant through the Opportunity Corps AmeriCorps Program ("AmeriCorps").  A local agency (and former co-defendant) called the Service Collaborative of WNY, Inc.-Opportunity Corps (the "Service Collaborative") received a grant award from the Corporation for National and Community Service to administer an AmeriCorps program.  Defendant wished to receive assistance from AmeriCorps and sought to be a sub-recipient of AmeriCorps funds by having AmeriCorps volunteers work there.  Accordingly, and some time before March 2012, the Service Collaborative and defendant entered a Memorandum of Agreement.  (Dkt. No. 40 at 26–31.)[1]

_____

[1] The document cited at this place in the record is a copy of what appears to be a version of the Memorandum of Agreement for the 2012–13 grant season.  Only one person signed this copy in September 2012.  Nonetheless, since defendant received AmeriCorps resources from the Service Collaborative and since plaintiff signed a contract with the Service Collaborative, *see infra*, the Court infers that a 2011–12 Memorandum of Agreement existed between the Service Collaborative and defendant.  The Court infers further that the terms of the Memorandum of Agreement remained the same in all substantive respects from one year to the next.

Additionally, plaintiff entered an AmeriCorps contract that set up her term of service with defendant. (Dkt. No. 29-1.)

Plaintiff's AmeriCorps contract filled a position with defendant that had the title of Project Specialist. (Dkt. No. 29-2.) Defendant summarized the position as follows in its job posting:

> The United Way of Buffalo & Erie County (UWBEC) is expanding the reach of its current Food Stamp-related efforts to focus on two targeted populations: low income working families and non-English speaking Legal immigrants. The program, known as the Targeted Food Stamp Outreach Program, will use the Project Specialist at The Salvation Army to deliver user-friendly, culturally appropriate, and linguistically competent Food Stamp outreach through education, engagement, and facilitated enrollment assistance. The Project Specialist will provide assistance with food stamp eligibility pre-screening, application completion and necessary follow-up to clients of the Emergency Family Assistance Program (EFA). Specifically, this position will be responsible for training other community partners to offer client workshops at their various Locations; offering application assistance at partner sites on a regular basis; assisting clients related to application documentation; and engaging in necessary client access activities and follow-up. Additionally, the Project Specialist will conduct workshops in financial literacy to clients of both the EFA and Employment Services programs.

(*Id.* at 1.) The job posting also listed several "Essential Functions":

- Prescreen individuals for food stamp eligibility
- Assist with food stamp applications and provide necessary follow-up
- Escort clients per request to ECDSS to assist with application process as needed
- Coordinate and conduct workshops on food stamps and financial literacy
- Collaborate with community partners for training staff and providing workshops

3

- Complete application assistance and support at partner sites
- All other duties as assigned

(*Id.*)  Finally, the job posting listed several "Proficiencies/Critical Skills":

- Experience working in the human service field as a case manager or financial literacy assistant
- Critical thinking and problem solving: the ability to make decisions, solve problems and take action as appropriate
- Superb written and oral communication skills
- Experience working with diverse, multi-cultural, and low-income populations
- Knowledge of food stamp procedures and regulations as well as ECDSS policies

(*Id.*)  Except for the omnibus essential function of "all other duties as assigned," the job posting made no mention of food distribution or other physical tasks requiring lifting.  The record contains one other document pertaining to the start of plaintiff's employment, a copy of what appears to be defendant's employee manual.  (Dkt. No. 40 at 19–21.)

Plaintiff began her employment with defendant on April 9, 2012.  Plaintiff did not consider herself a formal employee of defendant but rather a member of AmeriCorps.  The first few months appear to have proceeded uneventfully. Plaintiff traveled around town to visit different social agencies and to become familiar with resources that might be available for clients visiting defendant's office.  As plaintiff explained at her deposition, "I went out into the area, basically like I was instructed to do and like I was told was part of my job, to have people become familiar with the resources that was available out there and to help them.

The clients would come into the office when they would schedule an appointment at the Salvation Army, they would come into the office to meet with me if they had problems, if they want to sit down to find out if they did meet the requirements for food stamps, if they wanted to come in for budget counseling, if they wanted to come in for credit counseling, different things like that." (Dkt. No. 28-2 at 8.)  Plaintiff has asserted that she assisted a number of clients during her time with defendant, both with social services and with career services such as resume writing.  At some point in time, plaintiff also began working in defendant's pantry.  Defendant's services included distributing collected non-perishable food to individuals or families that qualified under its regulations.  Food distribution was not in plaintiff's job description but became part of her job.  Other people working in the pantry would load food items into bags; plaintiff helped carry the bags either to a client in the office or to a family's car, if the family happened to be receiving multiple bags.

The events that led to plaintiff's allegations began on June 22, 2012.  That morning, according to plaintiff, a Greyhound bus hit plaintiff's car as she was commuting to work.  Plaintiff suffered significant injuries including disc herniations, decreased range of motion, and chronic neck and back pain.  (Dkt. No. 40 at 35-40.)  Following a medical evaluation, plaintiff explained to defendant that she could not work in the pantry anymore.  Defendant allegedly "discarded" plaintiff's explanation.  (*See id.* at 16.)  Plaintiff continued to help with food

distribution as usual, though she occasionally used a cart when another person with back problems was not using it.  Plaintiff never asked whether other carts were available; defendant has asserted that it had other carts that it would have made available to plaintiff if plaintiff had asked.  As time passed, according to plaintiff, her supervisor began talking to her less and began altering her job duties.  Plaintiff's supervisor allegedly told her to stop scheduling clients and not to travel around town to maintain contact with other agencies.  Around November 9, 2012, plaintiff reported to work and told her supervisor that she could not work in the pantry that day because of severe pain.  (*See id.* at 26.)  Plaintiff's supervisor nonetheless assigned plaintiff to the pantry.  Around that time, defendant, through plaintiff's supervisor, also subjected plaintiff to something called a "hand scan."  The Court infers that the "hand scan," to use plaintiff's phrasing, had something to do with checking against employee fraud or theft, but the record does not provide details.  (*See id.* at 33 ("November 9th at two o'clock in the afternoon Delores comes to me and tells me she wants me to register for the hand scan.  So I asked her, I said, why after all this time and her response was, so I can keep tabs on you.  And I said to myself, okay, here we go.  I didn't say anything else.  I looked at her and I said okay.  And I went back to my desk and I closed my door.  And not too long after I went to her, she was sitting in her off ice and I said, what do you mean, keep tabs on me?  And she said, I need to know where you are at all times.  And I said, okay, how is that

supposed to work with me producing my time to Service Collaborative? She didn't answer me.").) Around November 26–28, 2012, plaintiff sought further medical attention to complain about a worsening of her injuries stemming from continued repetitive lifting in the pantry. (Dkt. No. 40 at 37–40.) One physician deemed plaintiff temporarily totally disabled for a time between November 28, 2012 through January 3, 2013. Another physician commented that "I couldn't understand how she was physically able to continue working." (*Id.* at 38.) In the middle of what appears to have been a time of deteriorating physical health, defendant fired plaintiff after a meeting on November 27, 2012.

The essential facts of this case would end more or less here, except for one major factual contention that did not appear in plaintiff's complaint and that defendant superimposes on her version of events. Sometime around mid-autumn 2012, plaintiff's supervisor started to notice that a certain client and her daughter started coming by regularly to see plaintiff. The client had visited defendant approximately three times in 2008 and not since 2009; the client suddenly started appearing frequently. (Dkt. No. 31 at 3.) The client's daughter appeared for the first time in August 2012 and visited three times that month, twice in September, and once in November before plaintiff's termination. (*Id.*) Curious to know why these two women needed to see plaintiff so much, plaintiff's supervisor pulled the client files and discovered two letters that plaintiff had written for the clients. (*See* Dkt. No. 31-4.) Plaintiff wrote each letter to Erie

County Family Court, on defendant's letterhead.  The letters describe efforts that plaintiff made for the clients regarding housing, social services, Child Protective Services, behavioral health services, parenting classes, and drug treatment.  On their faces, the letters do not make clear who initiated contact.

The parties differ sharply as to the significance of the letters.  Defendant has asserted that writing the letters "had nothing to do with the plaintiff's job description" and that plaintiff "seriously abused her position here."  (Dkt. No. 31 at 4.)  According to defendant, the letters led directly to a meeting on November 27, 2012 at which defendant fired plaintiff for writing the letters and for no other reason.  Also according to defendant, the letters reflected a large amount of time invested in social work for the two clients in question, time that "should have been devoted to work that she agreed to do when she accepted the opportunity to volunteer here."  (*Id.*)  Defendant was particularly upset about the use of its letterhead in a communication to a court; defendant claims that it has a "strict protocol" regarding court communications and that the protocol involves review of proposed communications by legal counsel.  Defendant has not clarified whether it reviewed any protocols about communications with plaintiff and whether plaintiff's essential functions pertaining to workshops and collaboration with community partners ever involved communications on agency letterhead.  That ambiguity dovetails with plaintiff's assertion that she had permission to use defendant's letterhead to write letters to address the social services needs of

8

clients.  (*See* Dkt. No. 40 at 2.)  Plaintiff also testified at her deposition that, at the termination meeting, at least some of defendant's representatives expressed doubt that plaintiff needed to be fired for writing the letters to Family Court.  (*See* Dkt. No. 28-2 at 32.)

Following her termination, plaintiff took procedural steps that led to the current litigation.  On May 13, 2013, plaintiff filed a Charge of Discrimination with the New York State Division of Human Rights; the Equal Employment Opportunity Commission ("EEOC") received the form on May 15, 2013.  (Dkt. No. 1 at 8, 10.)  The Court is not sure why plaintiff's administrative complaint spawned two EEOC charge numbers, but in any event, the EEOC issued twin Dismissal and Notice of Rights forms on October 30, 2013.  (*Id.* at 9, 11.)  Plaintiff then filed her complaint here on January 31, 2014.  Plaintiff used the form complaint available online.  Of the three options on the first page, plaintiff checked off a claim under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12112–12117.  Plaintiff also checked off a state claim on page 2, under the New York State Human Rights Law  ("NYSHRL"), N.Y. Exec. Law §§ 290–297.  Elsewhere in the form complaint, plaintiff checked off termination due to disability and failure to provide reasonable accommodations as the bases for her complaint.  (*Id.* at 4.)  Plaintiff also filled in that she first told defendant about her disability in September and November 2012.  (*Id.* at 5.)

Plaintiff attached some papers to the form complaint including a statement that summarizes her version of events.  (*Id.* at 12–13.)

Defendant filed the pending motion on March 31, 2015.  Defendant argues principally that plaintiff's claims fail because she was not defendant's employee. Defendant starts with the boxes that plaintiff checked off in the form complaint for liability under the ADA and the NYSHRL.  From there, defendant highlights that those statutes require an employer-employee relationship, and that AmeriCorps volunteers are not considered employees of the agencies where they volunteer. Alternatively, even if plaintiff counted as an employee, defendant submits an evidentiary argument under the heading, "Evidence Supporting the Plaintiff's Claim Is Extremely Weak, and The Salvation Army Has Submitted Ample Evidence That It Did Not Discriminate Against the Plaintiff, Requiring Dismissal of Her Complaint."  (Dkt. No. 28-4 at 6.)  Defendant asserts here that plaintiff's claims make no sense because it would not fire an employee who never stopped doing the work assigned to her, and because plaintiff's employment would have ended in a few weeks anyway.  With respect to the use of carts, defendant emphasizes that plaintiff could have made use of other carts on site if only she had asked.  Defendant concludes this part of the argument by noting its general mission and by noting that "[t]he idea that The Salvation Army would have ignored and rebuffed pleas of a worker suffering pain, for the use of a simple cart to transport grocery bags the short distance from the pantry to her office—a claim

supported only by the plaintiff's own skimpy and specious testimony—is simply unworthy [of] belief." (*Id.* at 7.)  Finally, defendant cites a valid, non-discriminatory reason for firing plaintiff, namely the use of agency letterhead. Defendant acknowledges that "[s]he may not have known of that protocol, as she had no duties that would foreseeably have required writing letters to a court, but purely by the exercise of plain good sense she either knew, or should have known, that contacting courts on behalf of clients was beyond her competence and required the involvement of qualified employees." (*Id.* at 8.)

Plaintiff opposes defendant's motion in several ways.  Plaintiff argues for employee status given that defendant contributed to her stipend, gave her the authority to write letters, and also gave the authority to endorse unspecified types of vouchers.  Plaintiff emphasizes that defendant ignored her medical situation on more than one occasion and knew that her daily tasks included repetitive lifting.  As for the letters to Family Court, plaintiff argues that her job in fact required her to make contact with other agencies regularly in behalf of her clients.  To the extent that plaintiff made contact in writing, she asserts that she had permission to use agency letterhead.  Plaintiff further argues that the content of the letters that she wrote to Family Court should not have caused any concern, since they are largely descriptive and provide only "a chronological status of events being afforded to participants within the community who were in need of assistance." (Dkt. No. 40-1 at 3.)

## III. DISCUSSION

### *A. Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

While applying the general principles outlined above, the Court will grant plaintiff some procedural leeway to accommodate her *pro se* status.  "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro*

*se* litigants. The rationale underlying this rule is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection . . . . The solicitude afforded to *pro se* litigants takes a variety of forms. It most often consists of liberal construction of pleadings, motion papers, and appellate briefs." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (citations omitted). "At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest; that we should not excuse frivolous or vexatious filings by *pro se* litigants; and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . . Under the circumstances, we must all do our best to gauge what is appropriate." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks and citations omitted).

### B. Do Any Antidiscrimination Statutes Apply?

The Court now turns to defendant's principal argument that plaintiff was not its employee. As mentioned above, defendant argues that the ADA and NYSHRL cannot apply to plaintiff because she cannot be considered its employee. This argument, and plaintiff's opposition to it, assume that the Court must view this case solely as an ADA or NYSHRL case based on a few checkmarks in a *pro se* litigant's form complaint. Defendant's argument also

rests heavily on a provision of the AmeriCorps governing statutes that states that "[a] participant shall not be considered to be an employee of the organization receiving assistance under the national service laws through which the participant is engaging in service." 42 U.S.C. § 12511(30)(B). The parties overlook the principle that a *pro se* litigant's claims must receive full consideration based on their substance and not on their initial appearance. "[T]he Rules do not require a plaintiff to plead the legal theory, facts, or elements underlying [her] claim. This is especially true in the case of *pro se* litigants, who cannot be expected to know all of the legal theories on which they might ultimately recover. It is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim." *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (citations omitted); *see also, e.g., Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 500 (E.D.N.Y. 1998) ("The courts have historically made every reasonable effort to construe the claims and defenses of *pro se* litigants as liberally as possible, and they are afforded every reasonable opportunity to demonstrate that they have a valid claim. Even when a plaintiff confuses various legal theories, the courts will scrutinize the complaint to determine whether the facts alleged would support a different theory.") (internal quotation and editorial marks and citations omitted). On substance, plaintiff claims that defendant discriminated against her by firing her wrongfully and by not providing a reasonable accommodation for a disability. Assessing the

substance of plaintiff's claim requires taking a deeper look at the statutes governing the AmeriCorps funding in question.

The Court's deeper look at the substance of plaintiff's claims begins with the Memorandum of Agreement that defendant entered to receive AmeriCorps funding. (Dkt. No. 40 at 26–31.) Under the Memorandum of Agreement, defendant sought to be a sub-recipient of an AmeriCorps grant award. (*Id.* at 26.) Defendant became a sub-recipient by receiving one full-time AmeriCorps service position used to fill the role of a Project Specialist. (*Id.*; *see also* Dkt. No. 29-2.) This arrangement, taking place under 42 U.S.C. §§ 12571(a) and 12572(c), made defendant a "program" under 42 U.S.C. § 12511(34) that carried out "projects" under 42 U.S.C. § 12511(35). Plaintiff was a "participant" under 42 U.S.C. § 12511(30)(A). Clarifying the parties' status under the AmeriCorps governing statutes is important because identifying them as a participant, a project, and a program triggers the nondiscrimination provisions of the statutes. "An individual with responsibility for the operation of a project that receives assistance under this subchapter shall not discriminate against a participant in, or member of the staff of, such project on the basis of race, color, national origin, sex, age, or political affiliation of such participant or member, or on the basis of disability, if the participant or member is a qualified individual with a disability." 42 U.S.C. § 12635(a)(1). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires.  For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  *Id.* § 12111(8).  "The term 'reasonable accommodation' may include (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  *Id.* § 12111(9).  Defendant's receipt of a service position, as a form of financial assistance, prompts review of another antidiscrimination provision as well.  "Any assistance provided under this subchapter shall constitute Federal financial assistance for purposes of Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), and the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), and shall constitute Federal financial assistance to an education program or activity for purposes of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)."  *Id.* § 12635(b).

As a result of the application of the governing statutes' antidiscrimination provisions, defendant's argument against a *pro se* litigant that the ADA and NYSHRL do not apply, even if correct,[2] is irrelevant. Defendant had an obligation not to discriminate against plaintiff on the basis of disability under Section 12635. Section 12635, in turn, explicitly puts the funding that supported plaintiff's job within the scope of several civil rights statutes. Of the statutes cited, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") covers discrimination on the basis of disability. *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). Since the Rehabilitation Act has an established private right of action and framework for pretrial analysis, the Court will construe plaintiff's complaint as asserting a claim under that statute for wrongful termination and failure to provide reasonable accommodations.

### C. Assessment Under the Rehabilitation Act

The Court now will assess defendant's motion within the context of the

---

[2] And the argument probably is correct, though the Court is not formally making that ruling. *See Self v. I Have A Dream Found.-Colorado*, 552 F. App'x 782, 784–85 (10th Cir. 2013) (unpublished decision); *see also Rodriguez v. Corp. for Nat'l Cmty. Serv.*, No. EP–09–CA–041–FM, 2009 U.S. Dist. LEXIS 67534, at *12–13 (W.D. Tx. June 23, 2009).

Rehabilitation Act. "Intentional discrimination claims pursuant to the Rehabilitation Act are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As relevant here, a plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext. In order to establish a prima facie case under the Rehabilitation Act, a plaintiff must show that the discrimination occurred 'solely' because of his or her disability." *Hodges v. Holder*, 547 F. App'x 6, 8 (2d Cir. 2013) (summary order) (internal quotation and editorial marks and citations omitted). "[A] plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following:(1) Plaintiff is a person with a disability under the meaning of the [Rehabilitation Act]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009) (internal quotation and editorial marks and citations omitted); *see also Logan v. Matveevskii*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014) (treating ADA and Rehabilitation Act claims as the same).

Here, several reasons prevent the Court from resolving plaintiff's claim short of trial. Plaintiff suffered a car accident on June 22, 2012 that left her with significant injuries including disc herniations, decreased range of motion, and chronic neck and back pain. (Dkt. No. 40 at 35-40.) The injuries limited plaintiff's ability to carry food bags from the pantry; in fact, as noted above, one of plaintiff's doctors has remarked that "I couldn't understand how she was physically able to continue working." (*Id.* at 38.) The record is underdeveloped as to how plaintiff's condition affected her life at home and her daily activities; for purposes of the pending motion, however, plaintiff receives the benefit of the doubt that her injuries constituted a disability. *See* 29 U.S.C. § 794(d) (borrowing the ADA standard for threshold disabilities); 42 U.S.C. § 12102(1) ("The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."). For purposes of defendant's motion, the Court also credits plaintiff's contention that defendant knew about plaintiff's limitations. Plaintiff has provided consistent evidence that she told her supervisor more than once that she could no longer lift food bags and that her supervisor ignored the concerns. Meanwhile, significant questions of fact surround the nature of plaintiff's job duties, reasonable accommodations for them, and defendant's refusal to provide accommodations. Work in the pantry appears nowhere in plaintiff's job description, except perhaps

indirectly under the generic description of "all other duties as assigned." How plaintiff wound up working in the pantry, the training for such work, and the details of carrying out such work are best left to a jury. At the same time, plaintiff has submitted testimony that the nature of her job required her to use defendant's letterhead regularly to advocate for clients who needed various social services. The Court cannot weigh factual evidence on a summary judgment motion, but plaintiff's contention appears reasonable enough to submit to a jury given her responsibility for traveling around town to maintain contacts with other social service agencies. A jury will be in the best position to examine what defendant's policy was with respect to letterhead, how plaintiff was trained for that policy, and how the two Family Court letters in question compare to any other letters that plaintiff wrote for other clients on defendant's letterhead.

Defendant has acknowledged in several ways that the factual disputes in this case are too cloudy for summary judgment. As noted above, defendant has invited the Court to weigh the available evidence, particularly how ample its evidence is and how weak plaintiff's evidence is. "Summary judgment is not appropriate when a genuine issue of material fact exists regarding the plaintiff's status as disabled." *MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia*, 32 F. Supp. 2d 600, 615 (W.D.N.Y. 1999) (Larimer, *J.*) (citation omitted). Defendant also has contended that plaintiff's claims are "unworthy of belief" by the very fact that a caring social service organization would not disregard significant

disabilities.  This contention is very subjective and almost implicates plaintiff's good faith.  "Subjective issues such as good faith are singularly inappropriate for determination on summary judgment."  *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 353 (2d Cir. 1981) (citation omitted).  Defendant also has asserted that plaintiff should have had the "plain good sense" not to send the Family Court letters.  What "plain good sense" means without the context of other uses of agency letterhead is unclear.

Defendant obviously feels strongly about the strength of the evidence in its favor, and it may yet prevail on the ultimate merits of the case.  A jury will have to make that decision, though, after sifting through the facts of plaintiff's medical condition and her daily efforts at carrying out her responsibilities in defendant's environment.  The Court thus recommends denying defendant's motion and sending the case to trial for a claim of wrongful termination and failure to accommodate under the Rehabilitation Act.

## IV. CONCLUSION

For all the foregoing reasons, the Court respectfully recommends denying defendant's motion (Dkt. No. 28) and setting the case for trial.

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent, on the date below, to counsel for defendant by electronic filing on the date below; the Court will mail on the date below a hard copy of this Report and Recommendation to

plaintiff, via first-class mail.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

__*/s/ Hugh B. Scott*_____ __
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: September 22, 2015